Lulie K. LIPSCOMB et al., Everett L. Rea, Infant, by Everett Foster Rea, His Father and Next Friend, Appellant,

v.

DISTRICT NATIONAL BANK OF WASHINGTON, D. C., a Corporation, et al., Appellee.

No. 79–2104.

United States Court of Appeals, District of Columbia Circuit.

Argued June 13, 1980.

Decided Aug. 25, 1980.

Allen A. Sperling, Washington, D. C., for appellant.

Bernard Carl, Washington, D. C., of the bar of the Supreme Court of Virginia pro hac vice by special leave of Court with whom David Povich, Washington, D. C., was on the brief for appellants, Lipscomb, et al.

Jerry M. Hamovit, Washington, D. C., entered an appearance for appellee, National Sav. & Trust Co.

Before McGOWAN and EDWARDS, Circuit Judges, and FRIEDMAN,* Chief Judge, United States Court of Claims.

Opinion for the Court filed by Circuit Judge McGOWAN.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

McGOWAN, Circuit Judge:

This appeal from the District Court involves a will admitted to probate in 1932 in the Supreme Court of the District of Columbia, the predecessor of the District Court. In particular, it relates to a testamentary trust created under that will, as to which annual accountings have continuously been filed in the District Court and in respect of which the District Court has retained jurisdiction to issue all orders necessary or appropriate to the proper administration of the trust estate.

The proceeding in the District Court was initiated by the filing of a petition by the trustee of the testamentary trust for instructions with respect to the proper distribution of the one-half of the trust estate presently remaining undistributed.[1] Before the court on cross-motions for summary judgment was the question of whether a child adopted by the testator's son subsequent to the testator's death was a "child" of the son within the meaning of that term as used in the will. The District Court concluded that it was; and, for the reasons hereinafter appearing, we affirm.

## I

On November 27, 1931, William P. Lipscomb, a successful business man resident in the District of Columbia, made his last will and testament. It was a short document, and contained only three categories of bequests. First, Lipscomb bequeathed two thousand dollars to one niece, and one thousand dollars to each of three other nieces. Second, he gave one thousand dollars to the Florence Crittenden Home for Unwed Mothers.

The third bequest is the source of this lawsuit. In it, Lipscomb placed in trust all the rest of his substantial estate. His wife, Lulie K. Lipscomb, was to receive the income from the trust during her life, and at her death their two children, George W. Lipscomb and Helen Lipscomb Rea, were each to receive one half of the income from the trust. At the death of either or both of those children, the trustee was directed to pay such income to which such child so dying would be entitled if living, to her or his respective *child or children*, if any there be, until such *child or children* shall severally arrive at the age of twenty-one years and then to convey an equal proportion of the trust estate to such *child or children* per stirpes. (Emphasis added.)

If one of William Lipscomb's two children died "without descendants," all the income from the trust was to be paid to the surviving child, and, after that child's death, to his or her "child or children" until they became twenty-one, when the corpus was to be distributed to them. If both William Lipscomb's children died "without descendants," then

> the corpus of my estate as it then remains shall be given to the Christian or Disciples Church Home for the Aged or Orphans provided there be one established at that time within ten (10) miles of the Capitol Building, in the District of Columbia, and if there be no such home, then the said corpus of the estate shall be used for the founding and maintenance of such Home, same to be named after my wife, Lulie K. Lipscomb.

William Lipscomb died in 1932, and his wife and his children are all now deceased. Lipscomb's daughter, Helen Rea, left one child, appellant Everett L. Rea, who has reached the age of twenty-one and who has, under the terms of the testamentary trust, duly received half the corpus of the trust. Lipscomb's son, George Lipscomb, also left one child, Sara Alice Lipscomb Holderness. She, however, was not the natural offspring of George Lipscomb, but was adopted by him in 1940, when she was seven months old. Because she was adopted, appellant Rea has asserted, both in the District Court and here, that she is not a "child" or "descendant" within the meaning of the will, and thus is not eligible to receive the other half of the corpus of the trust which should, rather, go to him. The District Court disagreed, and granted appellee Holderness's motion for summary judgment.

---

1. The District Court had jurisdiction under D.C. Code § 11–501 (1973 ed.).

## II

In ruling as it did, the District Court acted by reference to what it perceived, from the internal evidence supplied by the will taken as a whole, to be "an affirmative intent to include adopted children" within the words "child" or "descendant" as used in the terms of the trust. It stated in this regard:

The will reflects Lipscomb's awareness of and sensitivity for the welfare of infants most likely to be subject to the adoption process. Testator made a limited number of specific bequests and one of those was to the Florence Crittenden Home for Unwed Mothers. Additionally designated was a home for the aged or orphans as the contingent residuary beneficiary of the trust. These provisions demonstrate testator's awareness of and generosity towards persons outside the blood line who, like Sara Holderness before her adoption, may be homeless, fatherless, or whose conventional parental expectations had been disrupted.

In resisting the appeal to this court, appellee Holderness presses in the first instance the contention that the District Court correctly held that the special nature of the dispositions made by the testator point strongly towards what his intent may reasonably be taken to have been with respect to the question on which this case turns. We are reminded in this context that searching for intent in this manner has long been approved by this court. *See Young v. Munsey Trust,* 111 F.2d 514, 515 (1940), where we said:

The law in this jurisdiction, as well as in all the states of the United States, is that the intention of the testator is the basic and fundamental rule in the construction of wills, and the intention should be determined by construction of the whole will and not from detached paragraphs; and where the intention is apparent, it should be given effect . . . .

Alternatively, appellee Holderness invokes this court's decision in *Johns v. Cobb,* 402 F.2d 636 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1087, 89 S.Ct. 876, 21 L.Ed.2d 781 (1969). In *Johns* it was said that, "where the record and the inferences to be drawn therefrom do not suggest what the actual intent of the testator might have been, it is our duty to supply a reasonable intent by implication." *Id.* at 638. The guide in doing so would be current public policy, "in accordance with which we assume the testators would have wished their wills to be interpreted." *Id.* Although it had not done so at the time the wills in *Johns* and in the case at bar were drafted, the Congress has since 1954 statutorily accorded adopted children in the District of Columbia all the rights of natural offspring.[2] It was by reference to the public policy reflected in this development that the court in *Johns* concluded:

In keeping with this policy, and in view of the unmistakable trend of judicial decisions in other jurisdictions, we hold that, absent any contrary indication of the testators' actual intent, appellant should be deemed to be included within the terms of the testamentary gifts to "issue" in the wills now before us.

402 F.2d at 638.

## III

In affirming the result reached by the District Court, we do not find it necessary

---

**2.** Section 312(a) of Title 16 of the D.C.Code deals with the legal effects of adoption. It provides in part:

(a) A final decree of adoption establishes the relationship of natural parent and child between adoptor and adoptee for all purposes, including mutual rights of inheritance and succession as if adoptee were born to adoptor. The adoptee takes from, through, and as a representative of his adoptive parent or parents in the same manner as a child by birth . . . . .

Section 313 provides:

In the District, "child" or its equivalent in a deed, grant, will or other written instrument includes an adopted person, unless the contrary plainly appears by the terms thereof, whether the instrument was executed before or after [the decree of adoption] . . . .

Section 315 makes these provisions non–retroactive with respect to adoption decrees entered prior to June 8, 1954–the date of their original enactment into law.

to reach appellee's alternative contention founded upon *Johns.* We think the District Court's conclusion that the testator's intention with respect to the question at issue can accurately be divined from the provisions of the will itself was well within the range of rational choice available to it on this record. We are without warrant to disturb it.

The court in *Johns* had no such decisional option available to it, saying explicitly that "[W]e find nothing within the four corners of the will which assists us in ascertaining what the testators intended by the word 'issue,'" and again "[W]e are left, then, without any indication of the testators' intentions regarding inclusion of appellant within the terms of their wills." It was because of this situation that the *Johns* court looked to the current statutory policy as the touchstone of intent "consistent with the probable preference of the great majority of testators," there being "no contrary indication of the testators' actual intent." 402 F.2d at 637, 638.

Used in wills, the terms "children," "issue," and "descendants" have been ambiguous in significant part because social attitudes toward adopted children have been in flux, and courts have usually had no way of knowing to which social attitude a testator adhered. Here, however, the testator has within the four corners of the will itself unmistakably indicated his views on the issue: One of the three kinds of bequests William Lipscomb made was to the Florence Crittenden Home for Unwed Mothers. And, more importantly, another provided that should his own children die without descendants, the entire corpus of the trust, representing initially all of the property accumulated by him in his lifetime, would go to a home for orphans or the aged. So intent was he upon this latter gift that, if no such home existed in Washington, one was to be constructed with his funds and named after his wife. These were his only bequests to anyone outside his family, and they bespeak a wholehearted concern for the nurture of unwanted and uncared for children. Under these circumstances, we cannot believe, any more than could the

District Court, that William Lipscomb intended that such a child, if and when taken into his family by his son, should be excluded from his beneficence solely by reason of her adoptive status.

## IV

In arguing for reversal of the District Court, appellant Rea's reliance is upon this court's decision in *Riggs National Bank v. Summerlin,* 445 F.2d 201, *cert. denied,* 404 U.S. 851, 92 S.Ct. 91, 30 L.Ed.2d 91 (1971). That case involved a testamentary trust created by a will executed in 1929 by a testatrix who died in 1930. The beneficiaries of the trust were the testatrix's husband, daughter, and two grandsons. One of the grandsons in 1942 adopted a seven-year old child of his second wife; and the question litigated was whether that child could share in the eventual distribution of the trust estate as one of the "issue" of testatrix's grandson.

Addressing this issue, the court was quick to distinguish *Johns,* decided three years before, on the ground that the testatrix's intent to exclude adoptive children from "issue" as that word was used in her will was readily apparent from the provisions of the will itself, and that there was, accordingly, no occasion to look, as had the court in *Johns,* to the statutory policy on adoption formulated in 1954. *See* note 2 *supra.*

Thus, the case before us and *Riggs* are alike in the sense that in each the court purports to discern the intent of the testator with respect to adopted children by reference to the will viewed in its entirety. The similarity ends at the point, however, as will be seen from a comparison of the circumstances regarded as probative of intent in *Riggs,* on the one hand, and those in the Lipscomb will adverted to above, on the other.

The inference by the court in *Riggs* of a purpose by the testatrix to exclude adopted children is drawn from a number of considerations. Two aspects of the will itself, however, appeared to bulk largest in the court's conclusion. The first of these was

the fact that the "duration of the trust was marked by the life spans of testatrix's husband, daughter, grandsons, and the issue of the latter living at the time of her death." *Id.* at 205. This seeming preoccupation by the testatrix with having the class known at the time of her death caused the court to believe that she would not have wished this certainty of measurement of the life of the trust to be destroyed by a subsequent enlargement of the class after her death by the addition of an adopted great grandchild.

However significant this may possibly have been to the testatrix in *Riggs*, it has no relevance to the Lipscomb will, in which the duration of the trust is measured by the grandchildren becoming 21 years of age, whether or not they were in being at Lipscomb's death. Thus, it was of no consequence to Lipscomb that the measuring lives be known to him since, under his will, the measuring lives were not identifiable at his death irrespective of whether subsequently adopted children could become such measuring lives.

A second factor entering into the inferential deductions of the *Riggs* court was the fact the testatrix "used cross–remainders to maintain the trust benefits in the blood line should one of the beneficiaries, all of whom were in the blood line, die without issue." *Id.* at 207. The court stressed that by this device the testatrix assured that the trust assets would remain within her blood line for at least four generations.

Lipscomb, however, had no such fixation upon keeping his property within his blood line. His trust was not to go beyond his children and grandchildren. And if his chil-

dren, representing the first generation after him, died without descendants, the corpus did not go to blood relatives, such as the nieces for whom he had made bequests, but rather passed completely outside his blood relatives to an orphanage. It would appear odd indeed if Lipscomb, with his obvious interest in providing for the welfare of orphans, would have intended that this property should go to a home for orphans instead of to a grandchild who was herself one of the class about which he was so obviously concerned.[3]

The *Riggs* court, although stating that the word "issue" has some tendency to imply lineal blood descendants, expressly conceded that it is essentially an ambiguous word that "may or may not include adopted children." *In re Upjohn's Will,* 304 N.Y. 366, 374, 107 N.E.2d 492, 495 (1952). The characteristics of the will principally relied upon by the *Riggs* court to infer an intent to exclude adopted children are, as demonstrated above, not present in the Lipscomb will and therefore do not support the making of a like inference in the case before.

What remains of salient importance to the contrary inference drawn by the District Court with respect to the Lipscomb will are not highly technical drafting considerations but the plain evidence of Mr. Lipscomb's deep and abiding concern for homeless people and his obvious wish to alleviate their lot if the needs of his immediate family disappear. A person so motivated would hardly have intended to exclude from his family a child who became part of that family by adoption.

---

**3.** In respect of two extrinsic factors referred to by the court in *Riggs*, the circumstances in that case and this are similar. In each the adoption occurred after the death of the testator; and in each the adoption statute in effect at the time of the execution of the wills contemplated that an adoptee "shall not inherit from collateral relatives of or the parents of adoptor." 16 D.C. Code 205 (1940 ed.).

As to the former, any likelihood that Mr. Lipscomb would not wish to have any of his property pass to an adopted child not known to him is surely overborne by his obvious concern about the welfare of orphans generally.

As to the second, the *Riggs* court speculated that it seemed likely that an expert draftsman would tend to have in mind the current adoption and intestate succession laws, and to be responsive to them in his shaping of the will. But this speculation loses its force in the Lipscomb context of a testator whose interest was focused first upon his immediate family and, in default of any survivor of them, upon those unfortunates who were not sheltered by family relationships.

The District Court's grant of summary judgment is, accordingly, affirmed.

*It is so ordered.*