**Suzanne Nelson Legg READ, et al., Appellants,**

v.

**Katherine Kent LEGG, et al., Appellees.**

**No. 84–69.**

District of Columbia Court of Appeals.

Argued Nov. 7, 1984.

Decided June 13, 1985.

John Whitney, Washington, D.C., for appellants.

Charles J. Brown, for appellees.

Before NEBEKER, FERREN and ROGERS, Associate Judges.

ROGERS, Associate Judge:

This appeal is taken from a partial summary judgment that appellees, adopted children, are entitled to inherit as "lineal descendants" under a testamentary trust cre-

ated by their adoptive father's grandfather.[1] Appellants are natural blood relatives, great-grandchildren and great-great-grandchildren, of the testator. Since appellants have failed to show clear evidence of the testator's actual intent to exclude adopted children, *Johns v. Cobb*, 131 U.S. App.D.C. 85, 402 F.2d 636 (1968), *cert. denied*, 393 U.S. 1087, 89 S.Ct. 876, 21 L.Ed.2d 781 (1969), we affirm.

## I

William Beale Hibbs, the testator, executed his will on February 5, 1931, designating as co-trustees and co-executors the American Security and Trust Company and John S. Flannery, Esquire, the presumed will drafter and a recognized expert in the fields of estate planning and probate. In his will, the testator established a trust consisting mostly of personal property, for the benefit of his only child, Helen Hibbs Legg, under which she was to receive during her life the net income of the trust. Upon her death, the trustees were directed:

> to pay said net income, without power of alienation or anticipation, to her lineal descendants *per stirpes* until twenty (20) years after the death of the last survivor of such of her lineal descendants as shall be living at the time of my death, and then distribute the principal of my said estate ... among the lineal descendants of my said daughter then living *per stirpes* .... (emphasis in original).

The residuary clause provided:

> [I]f my said daughter should die without leaving any lineal descendants living at the time of her death, or should no lineal descendants of my said daughter live until the period of distribution of the residium of my estate ... then in trust to

distribute, assign and convey all my said remaining property and estate among my then living heirs at law and next of kin in the proportion in which they shall be entitled to receive the same as to my real estate under the laws of the descent in the several States where the same is situated, and as to my personal property under the law of the distribution in force in the District of Columbia at the time of my decease.

Helen Hibbs Legg's three male children and a grandchild, who was not an adopted child, were alive when the testator died on January 21, 1937. Mrs. Legg's last son died on December 27, 1976, and she died in 1979. The trust will terminate by its own terms on December 27, 1996, when Mrs. Legg's lineal descendants then living will receive the entire estate. All three of Mrs. Legg's sons married and had children; two sons had children by birth, and the third son had three children, the appellees, by adoption at infancy.

Subsequent to executing his will, the testator created several *inter vivos* trusts in which he disposed of his other real property not disposed of by *inter vivos* gift. The two *inter vivos* trusts at issue in the trial court were executed by the testator on December 31, 1931, and consisted, respectively of a $100,000 trust fund and two pieces of real property. Simply stated, the money trust provided for Helen Hibbs Legg during her lifetime and primarily for her son John, appellees' father, and his issue after Helen's death, but if his issue were extinct before John's youngest child was twenty-one, then one-half of the principal or corpus was to go in fee simple to John's unremarried widow and the other half was to continue in trust for one of Helen's other sons. Under the other trust

---

**1.** The original complaints were filed in 1980 by the American Security Bank, trustee under the testamentary trust, seeking construction of "lineal descendants" in item VIII of the will, and by the National Savings & Trust Company, trustee under the *inter vivos* trust of December 31, 1931, seeking construction of the term "issue." In subsequent pleadings, appellants and appellees sought construction of a second *inter vivos*

trust. The two lawsuits were consolidated by court order of November 18, 1981. American Security Bank and National Savings & Trust Company are not involved in this appeal. Joan Smith Legg, the widow of John Legg, the adoptive father, was also a defendant in the case filed by National Trust Company, but is not a party to the appeal.

of two pieces of real property, any trust income was to go to the testator's daughter, Helen, for life and thereafter to her son, John or to his "issue" who survived Helen; provisions were made for Helen's other sons only if John died before age thirty-five or surviving issue of his died before his youngest child attained age twenty-one. At the time of execution of the trusts, John was approximately two years old and his brothers were approximately twenty-one and eighteen years of age.

Helen executed her will on September 28, 1961, shortly after John had adopted a child. She left her estate to John and his "issue," and if none survived her, then to John's widow if living and if not, then to her other heirs at law. She provided in her will that a "legally adopted child shall have the same status, and all relations to or through him shall be determined in the same manner as if such child were a child of the blood of his adoptive parent...." Paragraph NINTH (3). She made no other provision for her two eldest sons or their "issue" because "they are adequately provided for in various trusts created by my father."

## II

■■ In reviewing a trial court's grant of a motion of summary judgment, we apply the same standard as the trial court in considering the motion for summary judgment.[2] *Holland v. Hannan*, 456 A.2d 807, 814 (D.C.1983); *Wyman v. Roesner*, 439 A.2d 516, 519 (D.C.1981). Accordingly, this court will affirm an order granting a mo-

tion for summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c). In limited circumstances, where the parties have filed cross motions for summary judgment and the motions "are based on the same material facts and address the same legal issues," the filing of the cross-motions may evidence the absence of any genuine issue of material fact. *Holland v. Hannan, supra,* 456 A.2d at 814 n. 9 and cases cited. When there is no dispute as to any material fact, the issue on appeal is whether the movant was entitled to a grant of summary judgment as a matter of law. *See Basch v. George Washington University,* 370 A.2d 1364, 1365, 1368 (D.C.1977).

■■ It is a cardinal principle of probate law that in construing a will, the intent of the testator is paramount. *Wyman v. Roesner, supra,* 439 A.2d at 520; *Scott v. Thropp,* 385 A.2d 1144, 1145 (D.C.1978); *see O'Connell v. Riggs National Bank of Washington, D.C.,* 475 A.2d 405, 407 (D.C. 1984). Thus the court's function is to ascertain the testator's intent and give full effect to that intention unless contrary to the law. *O'Connell v. Riggs, supra,* 475 A.2d at 407. To ascertain the testator's intent, the court examines the will as a whole, and not certain portions in isolation. *Wyman v. Roesner, supra,* 439 A.2d at 520; *Scott v. Thropp, supra,* 385 A.2d at 1146. The law in effect at the time of the testator's death is the relevant law for determining intent. *See O'Connell v. Riggs, supra,* 475 A.2d at 408 n. 2. Only if the intent of the testator cannot be dis-

---

2. This litigation involves the construction of a provision of a testamentary trust created on February 5, 1931, and two *inter vivos* trusts created on December 31, 1931 by William Beale Hibbs. The trial court designated the partial summary judgment, which addressed only the testamentary trust, a final order under Super.Ct. Civ.R. 54(b), and stayed action on the *inter vivos* trusts pending completion of this appeal. A Rule 54(b) certification would not in itself empower this court to review a grant of partial summary judgment; an order granting partial summary judgment which does not dispose of

an entire claim but only of a single issue is not appealable. *Cohen v. Owens & Co.,* 464 A.2d 904, 906 (D.C.1983) (citing *Liberty Mutual Ins. Co. v. Wetzel,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (other citations omitted)). Although the partial summary judgment was a partial adjudication insofar as the trial court did not construe the term "issue" in the *inter vivos* trusts, it is clear from the trial court's construction of "lineal descendants" that it would construe "issue" the same way. Accordingly, we see no reason to delay review.

cerned from the four corners of the will may the court examine extrinsic evidence to determine intent. *Wyman v. Roesner, supra,* 439 A.2d at 520; *Scott v. Thropp, supra,* 385 A.2d at 1146. If the "actual intent" cannot be discerned from the will or extrinsic evidence of record, the court will attribute to the testator an intent which is consistent with current public policy. *Johns v. Cobb, supra,* 131 U.S.App.D.C. at 87, 402 F.2d at 638.

The trial court found that the testator's "actual intent" regarding adopted children could not be determined from the four corners of the will or relevant extrinsic evidence, and that the will and relevant extrinsic evidence eliminated any inference that the testator intended to exclude adopted children. The court found the testator's will "obviously and successfully was designed to circumvent the rule against perpetuities in order to prolong the duration of the estate for as many years as possible." [3] The court deemed it significant that the testator did not limit his beneficiaries to his own lineal descendants but always provided for his daughter and her lineal descendants, and that it was undisputed his daughter, Helen, the principal beneficiary, viewed the adopted children as her lineal descendants. Further, the trial court found that the testator in his deed of trust made John and his issue the second primary beneficiaries; this extrinsic evidence suggested the testator could not have intended the "incongruous" result of precluding inheritance by these same parties. Also persuasive to the trial court was 'appellees' contention that the conceded preeminence of the drafter of the will argued against finding that the use of the term "lineal descendants" was intended to exclude adopted children, because he easily could

have expressly so provided in a single sentence had the testator considered and resolved the issue. The court noted the adoptions were undertaken in good faith and that the issue of how to construe the will had not arisen until Helen Legg's death in 1979.

Appellants contend the trial court erred because the testator's intent can be determined from the language of the will and the surrounding circumstances. Citing *Shoemaker v. Newman,* 62 App.D.C. 120, 65 F.2d 208, *cert. denied,* 290 U.S. 656, 54 S.Ct. 72, 78 L.Ed. 568 (1933), and the 1937 adoption statute, they argue the term "lineal descendant" is similar to the term "issue," and that in the 1930's, "issue" was confined to blood relatives.[4] They also contend the trial court erred in assuming *sub silentio* that the testator's use of "issue" in the deed of trust was intended to include adopted children. Relying on the analysis of *O'Connell v. Riggs, supra,* and *Riggs National Bank of Washington, D.C. v. Summerlin,* 144 U.S.App.D.C. 131, 445 F.2d 201, *cert. denied,* 404 U.S. 851, 92 S.Ct. 91, 30 L.Ed.2d 91 (1971), appellants argue that for adopted children to be included within the term "lineal descendants," the term would have to be defined differently for purposes of measuring the lives which determine the duration of the trust and identification of the beneficiaries in order to prevent mischief in defining the measuring lives of the trust. They point to the provisions in the will for the cross-remainders and against alienation as further indications of the testator's intent to confine his beneficiaries to his bloodline, and contend that the statutory law at the time the will was executed also indicates that the testator intended to exclude adopted children. They suggest this was clearly

---

**3.** The trial court noted, "[t]he testator undoubtedly expected the distribution to occur no less than twenty years after his death and more than likely fifty to one hundred years thereafter. In fact, the trust will not terminate until sixty years thereafter."

**4.** In the trial court, appellants argued that "lineal descendants" is "more emphatic" than "is-

sue" or "children." Appellees, in their brief and in the trial court, assume *arguendo,* that the terms "issue" and "lineal descendants" are "substantially equivalent." At oral argument, appellees suggested the two terms are similar but not necessarily synonymous. The trial court's opinion states that the parties conceded the two terms are synonymous.

understood by his daughter, Helen, who made appellees' father, John, her sole heir in her will. Finally, they argue that *Johns v. Cobb, supra,* was wrongly decided and is, in any event, distinguishable on its facts.

Appellees respond that appellants have failed to meet their burden under *Johns v. Cobb, supra,* to show that the testator actually intended to exclude adopted children. They argue that appellants' reliance on extrinsic evidence demonstrates the will is unclear with respect to the testator's intent regarding adopted children, and that the state of the law at the time of execution of the will and the testator's death was uncertain because the precise meaning of "lineal descendants" and the language in the District's adoption statute of 1895 ("making such child an heir at law of such petitioner, *the same as if such child was born to such petitioner*" was unknown.[5] (emphasis added). Arguing that the extent of involvement by Mr. Flannery, the presumed will drafter in the *Shoemaker v. Newman, supra,* litigation, is unclear,[6] appellees contend that as a prominent expert in the area of wills and estates, Mr. Flannery could easily have used language to exclude adopted children had the testator so intended, and that the will reflects the testator's ability to express his intentions. Further, appellees argue the provision on cross-remainders would not require "lineal descendants" to have different meanings within the will in order to be consistent

with the testator's intent because the adopted children were not lineal descendants at the time of the testator's death. In addition, there is no evidence in the instant case, as in *O'Connell v. Riggs, supra,* of an attempt to extend the life of the trust or of the adoptions being accomplished in bad faith to defeat the testator's intent. Appellees also argue that the cross-remainder clause is a standard provision in wills and offers no insight into the testator's intent with regard to adopted children.

The parties thus both take positions which are persuasive, notwithstanding the dilemma they pose for determining the testator's intent. Fortunately, this court does not proceed without guidance about the approach we must follow. We are bound to apply *Johns v. Cobb, supra, M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), and for the very reasons set forth in that opinion,[7] we are not reluctant to do so. The fact that both parties make persuasive arguments demonstrates the merits of the *Johns v. Cobb* canon of construction. The attribution of intent in the absence of clear evidence of actual intent is a task with which courts are familiar, and the canon avoids differing speculative conclusions about the mind of the testator when he does not clearly express it, *cf. In re Estate of Glover,* 150 U.S.App.D.C. 147, 151, 463 F.2d 1238, 1242 (1972) (court "cannot know the innermost workings of any person's mind"), as well as contradictory interpreta-

---

5. The 1895 Act, D.C.Code § 305, provided:
Jurisdiction is hereby conferred on any judge of the supreme court of the District of Columbia to hear and determine any petition that may be presented by a person or a husband and wife residing in the District of Columbia, praying the privilege of adopting any minor child as his or her or their own child, and making such minor child an heir at law. If the judge shall find, upon the hearing of such petition, that the petitioner is a proper person to have custody of such child, and that the parent or parents or guardian of such child have given their permission for such adoption, he shall enter an order upon the records of the court legalizing such adoption and making such child an *heir at law of such*

petitioner, *the same as if such child was born to such petitioner.* If the child has no parent or guardian the judge shall appoint a guardian ad litem. (emphasis added).

6. John S. Flannery, whom the parties concede was an expert in estate planning and probate matters, was one of the prevailing attorneys in *Shoemaker v. Newman, supra,* 62 App.D.C. 120, 65 F.2d 208. He was the testator's personal counsel, and the parties presume he drafted the will at issue and the codicils.

7. *See also Riggs v. Summerlin, supra,* 144 U.S. App.D.C. at 142–47, 455 F.2d at 212–17 (Robinson, C.J., dissenting).

tive approaches in divining intent.[8] The *Johns v. Cobb* approach, although not without the inherent difficulty which exists whenever there is uncertainty about actual intent, affords the parties an opportunity to persuade a court why the canon should not control in construing a particular will. Courts have not been reluctant to hold canons of construction inapplicable where the language of the will or extrinsic circumstances suggest a clear intent to limit devises to blood relatives, *Estate of Tower*, 470 A.2d 568, 573 (Pa.Super.Ct.1983) (in will testator named his "ten lineal descendants"), *aff'd*, — Pa. —, 487 A.2d 820 (1985), or where there is evidence of bad faith contrary to or as would interfere with a testator's intent. *O'Connell v. Riggs*, *supra*, 475 A.2d at 408.

In *Johns v. Cobb*, the United States Court of Appeals for the District of Columbia Circuit examined two wills, executed in 1922 and 1944, the first occurring two years before adoption of appellant who claimed a share under a testamentary trust as "issue" of his adoptive mother. The court held that neither the wills nor extrinsic evidence provided assistance in ascertaining what the testatrices intended by "issue," and that "enough uncertainty surrounds its usage that we doubt a competent draftsman who wanted to exclude adopted children would rely on the word 'issue' alone to express that purpose." 131 U.S.App.D.C. at 86, 402 F.2d at 637 (citing *In re Estate of Coe*, 42 N.J. 485, 494, 201 A.2d 571, 577 (1964)).[9] Accordingly, since the record and the inferences therefrom did not suggest what the "actual intent" of the testatrices might have been regarding adopted children, the court observed the testatrices may never have considered the issue and its duty was "to supply a reasonable intent by implication," by reference to public policy. *Id.* at 87, 402 F.2d at 638. The court found evidence of a general policy in the District of Columbia toward adopted children in the 1963 adoption statute, D.C.Code 16–312(a) (1967),[10] and in "the unmistakable trend of judicial decisions in other jurisdictions," to view adopted children as "issue" in the absence of any contrary indication of the testator's actual intent. *Id.* at 87, 402 F.2d at 638. Moreover, the court was impressed by the absence of any suggestion that the adoption was motivated by a desire to defeat other bequests under the wills. It also noted that the question before it was the intent of the testatrices, not the intent of the legislature in enacting the adoption statutes in effect at the time of their deaths. It therefore concluded that "absen[t] ... any ... evidence of testators' [sic] actual intent, we can perceive no reasonable basis for excluding appellant from sharing, as 'issue' of his mother, in the proceeds of the testamentary trusts." *Id.*, 402 F.2d at 638. The court opined that its conclusion was "consistent with the probable preference of the great majority of testators" and noted it had no reason to assume that testators who failed to clearly express their intent would have wished to discriminate against relations of the same

---

8. A similar canon has been used by other courts. *See Haver v. Herder*, 96 N.J.Eq. 554, 556, 126 A. 661, 662 (N.J.Ch.1924) (where the court, upon finding testator's use of "legal heirs" ambiguous and his intent uncertain, adopted rule of construction whereby legally adopted children included within class); *In re Tafel's Estate*, 449 Pa. 442, 296 A.2d 797, 800 (1972) (in construing the statutory clause "unless a contrary intention appears," court presumed testator intended to include adopted children within terms "child" or "children" in 1935 will); *see also In re Cave's Estate*, 326 Pa. 358, 366, 192 A. 460, 464 (1937) (testator can make will if he does not want a stranger to the blood to inherit under intestacy statute).

9. The court also cited Kales, *Rights of Adopted Children*, 9 Ill.L.Rev. 149, 158–174 (1914), for a discussion of early cases concluding that the "primary" meaning of "issue" includes adopted children.

10. D.C.Code § 16–312(a) (1967), *see infra* note 23, provides in pertinent part:

    The adoptee takes from, through, and as a representative of his adoptive parent or parents in the same manner as a child by birth, ....

degree "upon a biological basis." *Id.*, 402 F.2d at 638 (footnote omitted).

Most recently in *O'Connell v. Riggs, supra,* 475 A.2d at 405, this court looked to the four corners of a will and found that a testator's use of "issue" indicated an intention to exclude an adopted person. Viewing the case before it to be "substantially on all fours" with *Riggs v. Summerlin, supra,* the court concluded the result in *Riggs v. Summerlin,* was controlling. *Id.* at 409 n. 3.[11] The court found "reliable indices" of the testator's intent: first, a number of specific bequests of money to the testator's siblings, including one to be used for the education of the appellees who were his niece and nephew, which indicated to the court the testator's special concern for members of his bloodline; second, the contingency provision for cross-remainders in the testator's "next-of-kin," which the court found indicated the testator's intent to restrict the enjoyment of his estate to persons of his own bloodline, and third, the spendthrift clause which the court viewed as further evidence of the intention to confine the enjoyment of his estate to "family members." *Id.* at 408–09. However, in holding that "issue" did not include an adopted person, the court focused on the unusual circumstances of the adoption. The testator's sole surviving daughter, who was childless, had, at age 76, adopted appellant, to whom she was unrelated by blood or marriage, when appellant was 34 years of age. Approximately two months after the adoption, the daughter died. The court held that the adoption "was clearly an attempt to alienate the income and principal of the trust fifty two years after [the testator's] death." *Id.* at 408. The court distinguished *Johns v. Cobb* on its facts, and did not refer specifically to the language in *Johns v. Cobb* which foresaw the situation in which an adoption "was motivated by a desire to cut off other bequests under the wills." *Id.* 131 U.S.App.D.C. at 87 & n. 9, 402 F.2d at 638 & n. 9 (comparing *Noreen v. Sparks,* 92 App.D.C. 164, 204 F.2d 56 (1953), where the adopted persons were 20 and 26 years old and adopted after the death of the testator).

■■■ Upon examining the testator's donative scheme as evidenced in his will, we agree with the trial court that the testator's "actual intent" regarding adopted children cannot be determined from the four corners of the will. The term "lineal descendants" is not defined in the will and the law regarding that term with respect to adopted children was not without uncertainty at the time of the testator's death. *Compare Johns v. Cobb, supra,* 131 U.S. App.D.C. at 86–87 & n. 4, 402 F.2d at 637–38 & n. 4 and accompanying text, and *Riggs v. Summerlin, supra,* 144 U.S.App. D.C. at 134–35, 445 F.2d at 204–05 *with O'Connell v. Riggs, supra,* 475 A.2d at 408 n. 2.[12] But even were we to conclude that

**11.** In *Riggs v. Summerlin, supra,* 144 U.S.App. D.C. at 135, 445 F.2d at 205, the court noted it had "far more guidance" than was available in *Johns v. Cobb* because evidence of the testatrix's intent to exclude adopted children from her son's "issue" was available from within the four corners of her will. Specifically, the court found evidence of the testatrix's intent in the measurement of the duration of the trust, the fact the adoption occurred after the testatrix's death, the cross-remainders to the bloodline, and the District of Columbia adoption statute regarding intestate succession in 1929 when the will was executed and in 1930 when the testatrix died. The court conceded the term "issue" may or may not include adopted children. The testatrix's son had adopted a seven-year-old child in 1942, nine months before his death. The child was the natural child of the son's third wife and including her as issue would have diluted the

per stirpal share of the son's natural children. For over twenty-five years the will had been construed to exclude adopted children. Because of *Johns v. Cobb,* the trustee filed suit in 1969 for construction of the will. The court held, reversing the trial court, that the adopted child could not inherit through her adopted father as his issue. *Id.* at 141, 445 F.2d at 211. This court is not bound by *Riggs v. Summerlin, supra,* under *M.A.P. v. Ryan, supra,* 285 A.2d at 312.

**12.** In *O'Connell v. Riggs, supra,* 475 A.2d at 408 n. 2, the court relied on *Allen v. Reed,* 57 App. D.C. 78, 17 F.2d 666 (1927), in concluding that, when the *O'Connell* will was executed in 1926, the term "issue" was commonly understood to refer only to the natural offspring or "heirs of the body." In *Allen v. Reed,* the court was

the term had an established meaning when the will was executed, this jurisdiction has long declined to rely on technical terms as dispositive of a testator's intent. *Riggs v. Summerlin, supra,* 144 U.S.App.D.C. at 135, 445 F.2d at 205 (paucity of precedents and lack of direct holding counsel against such reliance); *Johns v. Cobb, supra,* 131 U.S.App.D.C. at 86, 402 F.2d at 637 (uncertainty surrounding usage).[13] The District of Columbia Circuit recently observed that as "[u]sed in wills, the terms 'children,' 'issue' and 'descendants' have been ambiguous in significant part because social attitudes toward adopted children have been in flux, and courts have usually had no way of knowing to which social attitude a testator adhered." *Lipscomb v. District National Bank of Washington, D.C.,* 203 U.S. App.D.C. 421, 424, 631 F.2d 1003, 1006 (1980).[14]

■ Viewing the will as a whole, we conclude that the cross-remainder and spendthrift clauses are unpersuasive as evidence of the testator's actual intent to exclude adopted children. Relatives of the testator are usually beneficiaries, and in the absence of further evidence of actual intent, we decline to rely on these clauses as indicative of an actual exclusionary intent when such inference is adverse to all adopted children.[15] Similarly, appellants'

---

**13.** required to construe "issue" as used in two provisions of a will. The will provided that the testator's "nephew and adopted son" would take if no "minor children" survived the testator's daughter. The court held that where "issue" was used in connection with the term "children," its meaning was restricted and controlled by the "well-defined" meaning of children, which referred to the immediate descendants in the first degree unless a contrary intent was indicated. When, however, "issue" was used alone, the court "construed [issue] as meaning descendants, which is its usual and ordinary sense, and that ... [i]n its legal sense, as used in ... wills ... 'issue' mean[t] descendants; lineal descendants; offspring." *Id.* at 79, 17 F.2d at 667.

As the New Jersey Supreme Court explained in *In re Coe, supra,* 42 N.J. at 494, 201 A.2d at 577, the reason for not relying on the technical meaning of words as dispositive arises from the fact that:

> ordinarily the word is not selected by the testator but rather by the scrivener, who, if he was conscious of the question whether adopted children should be in or out, would elicit the testator's wish and express it unequivocally. The cases at most attributed but *prima facie* meaning to such words, and a competent draftsman would not deliberately pick a word which instead of controlling the context is easily colored by it.

**14.** In *Lipscomb v. District Nat. Bank, supra,* a 1931 will established a trust with its income to go to the testator's wife for her life, then to their two children and upon death of either or both, the income was to go to their "child" or "children" until age 21, and then the trust estate was to be conveyed to the children per stirpes; if no "child," then the corpus was to go to a home for the aged or orphans. The testator died in 1932.

A son adopted a child in 1940 when the child was seven months old. The trial court found "an affirmative intent to include adopted children" within the will as a whole. *Id.* at 423, 631 F.2d at 1005. Without relying on the *Johns v. Cobb* canon, the Circuit Court affirmed, holding the trial court's conclusion about the testator's intent was "well within the range of rational choice available to it on this record," given the plain evidence of the testator's concern for homeless people. *Id.* at 424, 631 F.2d at 1006. The court viewed *Riggs v. Summerlin, supra,* and the *Lipscomb* cases as alike since "in each the court purports to discern the intent of the testator with respect to adopted children by reference to the will viewed in its entirety," but distinguished the *Riggs v. Summerlin* court's focus on the measuring lives and cross-remainders, because in *Lipscomb* the trust duration was measured by the grandchildren becoming age twenty-one whether or not they were in being at Lipscomb's death, and the testator had no fixation upon keeping his property in his bloodline since the trust was not to go beyond his grandson. *Id.* at 424–25, 631 F.2d at 1006–07. The court noted that the "speculation" by the *Riggs v. Summerlin* court that the expert draftsman "would tend to have in mind the current adoption and intestate succession laws, and to be responsive to them in his shaping of the will," lost its force in view of Lipscomb's interest which "focused first upon his own immediate family and, in default of any survivor of them, upon those unfortunates who were not sheltered by family relationships." *Id.* at 425 n. 3, 631 F.2d at 1007 n. 3. It further noted the *Riggs* court had conceded that the term "issue" "may or may not include adopted children." *Id.* at 425, 631 F.2d at 1007.

**15.** These circumstances [the commonplace, recurring facts of life] are much too weak to

contentions regarding the measuring lives of the trust are unpersuasive. The adoptions at issue could not affect the term of the trust,[16] and *Riggs v. Summerlin, supra,* acknowledged the measuring lives provision was not the dispositive provision. *Id.* 144 U.S.App.D.C. at 136, 445 F.2d at 206. *See* D.C.Code § 45–405 (1981). Hence, we need not construe "lineal descendants" to have a different meaning for measuring the life of the trust than for identifying the beneficiaries of the trust.[17] Unlike the will in *O'Connell v. Riggs, supra,* there are no monetary bequests to rely on as evidence of the testator's intent since two codicils in 1932 and 1934 deleted the bequests to the testator's sisters, his employees and a hospital fund. Further, while the residuary clause phrase "at the time of my decease" can be read, as appellants contend, to apply to the entire clause, and not as the trial court suggested to indicate the testator's willingness to have his real property inherited according to the law in effect after his death, the clause itself demonstrates that the testator could be specific where he wished to express his intent. It also indicates he was not restricting the devolvement of all of the trust corpus according to District of Columbia law.

Nor do we find the extrinsic evidence relied upon by appellants to be persuasive evidence of the testator's actual intent to exclude adopted children. The two trusts are more generous to John than to Helen's other sons, suggesting the testator's con-

cern for John and any family he might have, in view of the young age of John as compared to his brothers; John's children would come into being many years later. Such concern is not, in our view, indicative of the testator's intent to exclude John's children from his will. Thus we agree with the trial court that the trusts are indicative of the testator's clear intent to provide for the support of his daughter, her children and their families. Further, the inclusion of John's widow in the money *inter vivos* trust further suggests that the testator's general purpose was to provide for his daughter's children's families, including an unremarried widow, a stranger to the blood, who would take in fee simple under that trust.

Nor do we think the fact that appellees' adoptions occurred after the testator's death should be viewed as were the adoptions in *O'Connell v. Riggs, supra,* 475 A.2d at 408 and *Riggs v. Summerlin, supra,* 144 U.S.App.D.C. at 137, 445 F.2d at 207. In *Johns v. Cobb, supra,* 131 U.S. App.D.C. 86 n. 2, 402 F.2d at 637 n. 2, the court noted that it did "not attach great importance to [the fact the adoption occurred before execution of the will] except to the extent that it suggests the proceedings were undertaken in good faith." In the instant case there is neither a conflict between the natural and adopted children of the adopting father's several marriages over the *per stirpal* share or an adoption of brief duration, as in *Riggs v. Summerlin,* nor an adoption of an adult shortly

---

evidence an intent to confine the trust benefits to issue by birth. A testator normally picks as the objects of his bounty those who are closest to him; more frequently than not, those picked *eo nomine* just happen to be relatives by blood. So also when the gift is to a class, it is usually a class of relatives.
*Riggs v. Summerlin, supra,* 144 U.S.App.D.C. at 144, 445 F.2d at 214 (Robinson, C.J., dissenting).
Nor do we find persuasive *Noreen v. Sparks, supra,* cited by appellants in support of their contention that provision for cross-remainders shows an intent to continue descent to blood relatives, as that case involved a will which was probated in 1880, before the 1895 District of Columbia adoption statute.

**16.** We do not view the phrase "lineal descendants as shall be living at the time of [the testator's] death," to mean more than that anyone who on the date of his death was a lineal descendant would be a measuring life. *See Lipscomb v. District Nat'l Bank, supra,* 203 U.S.App. D.C. at 425, 631 F.2d at 1007. *But see Riggs v. Summerlin, supra,* 144 U.S.App.D.C. at 136 & n. 9, 445 F.2d at 206 & n. 9.

**17.** Consistency in construing terms in different provisions of a will, however, is not invariably required. *Compare Allen v. Reed, supra* note 13, 57 U.S.App.D.C. at 79, 17 F.2d at 667, *with Riggs v. Summerlin, supra,* 144 U.S.App.D.C. at 136 & n. 11 & 12, 445 F.2d at 206 & n. 11 & 12.

before the adoptive parent's death under circumstances which suggested the purpose of the adoption was to cut off other bequests under the will, as in *O'Connell v. Riggs.* Rather, it is undisputed that appellees were adopted in good faith and at infancy and raised as the only children of John and his wife, Joan. In our view, these circumstances weigh against attributing to the testator an intent to discriminate on a biological basis.[18]

Appellants argue, nevertheless, that the testator's intent was clear because of the involvement of the presumed drafter of the will, Mr. Flannery, who was a counsel of record in *Shoemaker v. Newman, supra,* 62 App.D.C. 120, 65 F.2d 208, which was decided by the trial court before the testator's will was drafted and decided on appeal before his death. Both parties agree that the significance of Mr. Flannery's involvement relates to his awareness of the issue of inheritance rights of adopted children. *Shoemaker v. Newman* involved the question of whether a will devising real property violated the rule against perpetuities. The testator had died in 1891. After holding that the will did not violate the rule against perpetuities, the court held that the adopted grandson was not entitled to inherit through his adoptive father as "lawful issue." In construing a will which was written before the 1895 D.C. adoption statute, the court, *id.* at 126, 65 F.2d at 214, observed that under intestacy law

> [i]t is settled law, we think, that an adopted child inherits only from his adopted parents, and does not inherit through the foster parents, from direct or collateral kin [citing cases from Illinois, Iowa, Kentucky, New York, Ohio,

Tennessee, Vermont, and Annot., 30 A.L.R. 1407].

No prior decision in this jurisdiction has held that the term "lineal descendants" excludes adopted children. Nor has any court in this jurisdiction relied on *Shoemaker v. Newman, supra,* as decisive authority in interpreting a testator's intent to exclude adopted children. *Riggs v. Summerlin, supra,* 144 U.S.App.D.C. at 135, 445 F.2d at 205 (paucity of precedent); *Johns v. Cobb, supra,* 133 U.S.App.D.C. at 86 n. 3, 402 F.2d at 637 n. 3 ("one-paragraph discussion of adoption problem in *Shoemaker v. Newman*) was inconclusive and apparently related to intestate distribution rather than testamentary intent"). We do not view Mr. Flannery's participation in *Shoemaker v. Newman* as giving greater weight to that decision since the issue before us is whether the testator evidenced an intent contrary to the inclusion of adopted children, and not Mr. Flannery's knowledge regarding the construction of an intestacy statute or the purportedly "established" legal meaning of "lineal descendant."

With respect to the conceded expertise of the drafter of the will, we agree with the trial court that the inferences weigh against appellants. The care and precision with which the will was drafted are evidence of its purpose to avoid the rule against perpetuities, as the trial court found. The will, as well as the *inter vivos* trusts, also presumably prepared by Mr. Flannery, demonstrates the testator's ability to express his intent clearly when he had one. The drafter's expertise is hardly consistent with the view that had the testator actually intended to exclude adopted children, the drafter would have chosen impre-

---

18. As the New Jersey Supreme Court observed in *In re Coe, supra,* 42 N.J. at 490, 201 A.2d at 575:

> We cannot believe it probable that strangers to the adoption would differentiate between the natural child and the adopted child of another. Rather we believe it more likely that they accept the relationships established by the parent whether the bond be natural or by adoption and seek to advance those rela-

tionships precisely as that parent would. None of us discriminates among children of a relative or friend upon a biological basis. *See In re Patrick's Will,* 259 Minn. 193, 106 N.W.2d 888, 890 (Sup.Ct.1960); *In re Trusteeship Agreement with Nash,* 265 Minn. 412, 122 N.W.2d 104, 109 (Sup.Ct.1963). We ought not impute to others instincts contrary to our own. Nor should we think we are different from our ancestors in 1877.

cise language which resulted in reliance on the ad hoc determinations of the courts. *See* T. ATKINSON, HANDBOOK OF THE LAW OF WILLS § 31, at 66 (1937). The drafter did not use the precise term "issue" which was then being construed in the District of Columbia to exclude adopted children; nor did he clarify the term in the 1934 codicil which was executed after the appellate court had decided *Shoemaker v. Newman, supra.* Moreover, prior to execution of the will, this jurisdiction had put testators and their attorneys on notice that a testator's intentions should be "clearly expressed ... and not left ... to obscure and doubtful construction." *Allen v. Reed, supra* note 13, 57 App.D.C. at 80, 17 F.2d at 668.

We have also examined the adoption statutes in existence at the time the will was drafted. While adoption statutes do not determine the testator's intent, *Johns v. Cobb, supra,* 131 U.S.App.D.C. at 87, 402 F.2d at 637, this court has recognized that references to them may be helpful in determining the established meaning of a term in a will. *O'Connell v. Riggs, supra,* 475 A.2d at 408 n. 2. Normally, however, the presumption that a will is drafted in accordance with the law in existence at the time of the testator's death has a somewhat different meaning than is urged upon here. *See Shoemaker v. Newman, supra,* 62 App.D.C. at 124, 65 F.2d at 212 (will drafted to avoid prohibitions of rule against perpetuities); *Brooks Bank & Trust Co. v. Rorabacher,* 188 Conn. 202, 171 A. 655 (1934) (in absence of will, intestacy statute determines whether adopted children inherit). Appellants urge that the law so clearly prohibited adopted children from inheriting through their adoptive parents that it would do violence to the testator's intent to hold that he used the term "lineal descendants" in his will in a contrary sense without explicitly saying so.

The adoption statute in effect when the will at issue was executed was the Act of 1895. *See supra* note 6. It provided the means by which a child could become a legal member of a family not his own, and made "the order of adoption mandatory if the judge [found] that a petitioner [was] a proper person to have custody of a child, and the parent, parents, or guardian [had] given consent." H.R.REP. No. 1274, 75th Cong., 1st Sess. 1 (July 21, 1937). Appellants urge that the 1937 amendment to the District of Columbia Adoption Act of 1895 is the relevant statute since the testator died in 1937 and that it is indicative of the practice and understanding of the times relevant here. That amendment provided that an adoptee could not inherit from the collateral relatives of the adoptive parent. *Id.* at 2; S.REP. No. 1034, 75th Cong., 1st Sess. 3 (July 22, 1937). But even agreeing with appellants that the 1937 Act limited rights which adopted children previously had,[19] the testator in the instant case died on January 21, 1937, before the 1937 Act became effective on August 25, 1937. Therefore, it is the prior law which is relevant in construing Mr. Hibbs' intent in his will. *O'Connell v. Riggs, supra,* 475 A.2d at 409. Appellants cite no case in this jurisdiction, and we have found none, decided prior to the testator's death interpreting the meaning of the 1895 adoption statute with respect to an adopted child's right to inherit through his adopted father. Therefore, for the reasons previously discussed, we agree with the trial court that neither an examination of the will nor the relevant extrinsic evidence suggests that the testator ever expressly intended to exclude adopted children.

Appellants' final argument is that *Johns v. Cobb* was wrongly decided because its canon of construction is contrary to congressional intent and the way wills traditionally have been construed in Anglo-

---

19. *Riggs v. Summerlin, supra,* 144 U.S.App.D.C. at 138, 445 F.2d at 208 (1937 amendment to the D.C. Adoption Act reaffirmed status of adopted child as equal to natural child in relation to the parent, but specifically provided such child shall not inherit from parent of the adopter); *Hall v. Scarlett,* 86 U.S.App.D.C. 165, 166, 181 F.2d 277, 278 (1950) (the whole concept of adoption was altered by the 1937 Act), *cert. denied,* 341 U.S. 925, 71 S.Ct. 796, 95 L.Ed. 1357 (1951).

American legal history, citing *Riggs v. Summerlin, supra,* 144 U.S.App.D.C. at 140–41, 445 F.2d at 210–11. They urge replacement of the *Johns v. Cobb* canon of inclusion of adopted children with the *Riggs v. Summerlin* presumption of exclusion of adopted child in the face of standard and neutral provisions in a will. *Riggs v. Summerlin, supra,* 144 U.S.App. D.C. at 135, 445 F.2d at 205.

Of course, whichever canon or presumption applies, the courts must search for evidence of the testator's actual intent. Without repeating what we have already said about the *Johns v. Cobb* canon, we note that the District of Columbia Circuit has confined *Riggs v. Summerlin* to its facts. *Lipscomb v. District Nat'l. Bank, supra,* 203 U.S.App.D.C. at 424–25, 631 F.2d at 1006–07. We also view *O'Connell v. Riggs* to be consistent with the *Johns v. Cobb* canon since the court found evidence within the will which satisfied it that the adoption was "clearly an attempt to alienate the income and principal of the trust" long after the testator's death. *O'Connell v. Riggs, supra,* 475 A.2d at 408; *Johns v. Cobb, supra,* 131 U.S.App.D.C. at 87, 402 F.2d at 638. The real and imagined fears suggested by appellants in urging a return to the stranger-to-the-adoption doctrine are readily met in the instant case where the children were adopted at an early age and reared by the adoptive parents.[20] Moreover, contrary to appellants' assertion, Congress has observed that application of the stranger-to-the-adoption doctrine of exclusion of adopted children conflicts with the probable intentions of most testators.[21] Indeed, one commentator has suggested that the application of that doctrine

> is better explained as a reflection of judicial method, bent upon limiting the impact of legislation in derogation of common law.... [Footnote omitted].

Halbach, *supra* note 21, at 976.

In sum, the inclusion of appellees as the "lineal descendants" of the testator's daughter is in accordance with the clear purpose of the testator to provide for his daughter's family and their families. We find no credible evidence in the record that the testator ever considered the question of adopted children or that if he had he would have discriminated among his daughter's "lineal descendants" on that basis. To adopt appellants' position would require us to reach the unwarranted assumption that, simply because the testator was not a party to the adoptions, he probably intended to benefit only "natural" children.

Absent evidence of the testator's actual intent to discriminate against adopted children or another reasonable basis for excluding appellees from sharing as "lineal

**20.** Professor Halbach suggests such fears are met by a canon of construction or statutory presumption which includes "a special concept of loco parentis" whereby the basic rule of inclusion is limited to children who were adopted at a relatively early age and reared by the adoptive parents. Halbach, *The Rights of Adopted Children Under Class Gifts,* 50 Iowa L.Rev. 971, 990 (1965). The *loco parentis* concept safeguards against the conscious use of adoption to upset a transferor's normal expectations, as in an adoption of an adult solely to provide an heir or class beneficiary where the normal responsibilities of parenthood are not assumed, or an adoption employed for the purposes of financial gain or as a spite device. *Id.* at 987–88. Professor Halbach suggests the *loco parentis* concept is more likely to be in harmony with the types of relationships a testator has in mind defining a class designation in terms of "children" and the like. He notes:

> Rather than thinking of technical, legal relationships, he probably had some vague expectation or general notion concerning a type of actual, personal relationship. He would naturally assume that the legal and personal relationships would coincide, but the legal relationship created by adoption alone would not satisfy his expectation without that special kind of personal involvement which is typically associated with the parent-child relationship. [Footnote omitted].
> *Id.* at 989.

**21.** After the 1937 amendment, the next pertinent amendment to the District of Columbia Adoption Act occurred in 1954. It provided that an adopted child could inherit from and through his adopted parent, and was intended to be consistent with what most testators would want. *Riggs v. Summerlin, supra,* 144 U.S.App.D.C. at 139, 445 F.2d at 209 (citing H.R.Rep. No. 1347, 83rd Cong., 2d Sess. 7 (1954)).

descendants" of the testator's daughter, we hold appellants have not met their burden to show the testator intended more than to control the distribution of his estate among the members of his daughter's and her son's families for as many years as was lawfully possible. Therefore, under *Johns v. Cobb,* we must attribute an intent which is in accordance with public policy. That general policy is reflected in the 1963 adoption statute, as amended, D.C.Code §§ 16–312(a), –313 (1981),[22] under which appellees were lawful lineal descendants of the testator's daughter as of the date of their adoption. Accordingly, we affirm the judgment of the trial court, and remand this case for proceedings consistent with this opinion.

*So ordered.*

22. D.C.Code § 16–312(a) provides in pertinent part:

A final decree of adoption established the relationship of natural parent and natural child between adoptor [adopter] and adoptee for all purposes, including mutual rights of inheritance and succession as if adoptee were born to adoptor [adopter]. The adoptee takes from, through, and as a representative of his adoptive parent or parents in the same manner as a child by birth, ....

D.C.Code § 16–313 provides:

In the District, "child" or its equivalent in a deed, grant, will, or other written instrument includes an adopted person, unless the contrary plainly appears by the terms thereof, whether the instrument was executed before or after the entry of the interlocutory decree of adoption, if any, or before or after the final decree of adoption became effective.